FILED

1  Lindon Andre Voglezon II

2  b ✕✕✕✕ gmail.com

3  ✕✕✕✕✕✕✕

4  Simi Valley, California, ✕✕

5  ✕✕✕-9040

6  Plaintiff in Pro Se

7

2026 FEB 11  PM 12: 28

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY: _____ 337

8           **UNITED STATES DISTRICT COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
9             **SOUTHERN DIVISION – SANTA ANA**

10

11  Lindon Andre Voglezon II,

12           Plaintiff,

13      vs.

14  CIG Financial, LLC, dba

15  AUTONATION FINANCE

16

17  VALENCIA B IMPORTS, INC., dba

18  VALENCIA BMW, also known as

19  "AUTONATION BMW VALENCIA"

20           Defendants.

Case No.: 8:25-cv-02407-FWS-ADS

Hon. Fred W. Slaughter
United States District Court Judge

**FIRST AMENDED COMPLAINT**

JURY TRAIL DEMANDED

21  **INTRO:**

22      Plaintiff brings this action under the Fair Credit Reporting Act ("FCRA"),

23  15 U.S.C. § 1681 et seq., because Defendants obtained and used Plaintiff's

24  consumer reports—and caused multiple hard inquiries at Experian, Equifax, and

25  TransUnion—without a permissible purpose and outside any permissible scope.

26  Plaintiff arrived with a Navy Federal Credit Union ("NFCU") pre-approval and

27  expressly declined dealership-arranged financing. On a speakerphone call audible

28  to Plaintiff, witness Christian Wright, and salesperson Trevor Carr, NFCU told

1 sales manager Greg Poland that NFCU had already run credit, Plaintiff did not
2 need to apply for dealership financing, and NFCU would be the lender. Plaintiff
3 then attempted to leave to prevent any credit pull. Defendants nevertheless insisted
4 they "must pull credit" for "identity verification," and then used the report results
5 (including telling Plaintiff his score was "747") to pressure Plaintiff to abandon
6 NFCU and accept dealership-arranged financing, including specific alternative
7 terms.

9 This case is therefore about **purpose and scope**: Defendants did not obtain
10 Plaintiff's consumer reports to complete an NFCU-funded purchase, but to solicit
11 and negotiate dealership financing and to lender-shop Plaintiff's credit after
12 Plaintiff refused and did not initiate a dealer-credit transaction.

*Lindon Andre Voglezon II v. CIG Financial, LLC dba AutoNation Finance, and Valencia B Imports, Inc. dba Valencia BMW*

Plaintiff submits the following exhibits in support of his Complaint:

**INDEX OF EXHIBITS**

(First Amended Complaint)

| Exhibit | Description |
|---|---|
| **Exhibit A** | **Navy Federal Credit Union Pre-Approval** (dated July 10, 2025) — "Congrats! Your Auto Loan Is Preapproved." |
| **Exhibit B** | **Credit Report Inquiry Evidence** — screenshots showing hard inquiries dated **on or about July 15–17, 2025** (Experian/Equifax/TransUnion) with subscriber names/addresses reflecting "AutoNation Finance" and "ADP AutoNation" variants. |
| **Exhibit C** | **Email(s) to Dealership Management** (dated July 25, 2025) — Plaintiff's written notice and demand for deletion/correction describing outside financing, speakerphone NFCU call, refusal of dealer financing, and request for inquiry removal. |
| **Exhibit O-2** | **Declaration of Christian Wright (Supplemental)** — corroborating the speakerphone NFCU call sequence, Plaintiff's walk-out attempt, "identity verification" pressure, score reference, rate pitches, and repeated refusals. |

Plaintiff reserves the right to submit additional exhibits as discovery proceeds.

1

## JURISDICTION

2

1.    This Court has jurisdiction pursuant to **28 U.S.C. § 1331** because this action

3

arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq.

4

## VENUE

5

6

2.    Venue is proper under 28 U.S.C. § 1391(b); for venue purposes Defendants

7

'reside' in this District under § 1391(c)(2) and (d).

8

3.    **DIVISION (Southern — Santa Ana).** Assignment to the Southern Division

9

is proper because Defendant CIG Financial, LLC resides and conducts relevant

10

operations in Orange County, and a substantial part of the events or omissions

11

giving rise to the claims— including consumer report access through

12

Defendants' financing channel(s) and related operations—occurred in this

13

District. See 28 U.S.C. § 1391(b), (c)(2), (d).

14

## PARTIES

15

4.    Plaintiff's name is Lindon Andre Voglezon II is a natural person and a

16

"consumer" under 15 U.S.C. § 1681a(c).

17

5.    Defendant **CIG Financial, LLC** does business as "AutoNation Finance"

18

and is a "person" and "user of consumer reports" within the meaning of the

19

FCRA, and/or caused consumer report inquiries as alleged herein.

20

6.    Defendant **Valencia B Imports, Inc.** operates the automobile dealership

21

known as "Valencia BMW / AutoNation BMW Valencia."

22

7.    At all relevant times, Defendants acted through their employees and agents,

23

including Sales Manager **Greg Poland** and Salesperson **Trevor Carr**, acting

24

within the course and scope of their authority.

25

26

8.    **Doe Defendants.** Plaintiff is presently unaware of the true names and

27

capacities of **Does 1–10**, including finance subsidiaries, platform providers,

28

and individuals involved in obtaining or using Plaintiff's consumer reports.

1      agency/alter-ego allegations when ascertained.

## TIMELINESS / STATUTE OF LIMITATIONS

9.    Plaintiff's claims are timely under 15 U.S.C. § 1681p because they were filed within the earlier of (i) two years after discovery of the violations alleged herein, or (ii) five years after the date of the violations.

## FACTUAL ALLEGATIONS

### A. Plaintiff had outside financing and declined dealership-arranged financing

10. Before visiting Defendants' dealership, Plaintiff obtained independent outside financing through Navy Federal Credit Union ("NFCU").

11. On or about July 15, 2025, Plaintiff visited Defendants' dealership to purchase a 2023 Lexus ES 300h. From the outset, Plaintiff made clear that Plaintiff intended to use NFCU funding and **did not want dealership-arranged financing**.

### B. NFCU speakerphone call; Plaintiff begins leaving to prevent a credit pull

12. Before July 15, 2025, Plaintiff communicated with salesperson Trevor Carr about the vehicle and informed him that Plaintiff had an NFCU pre-approval and intended to use outside financing.

13. On July 15, 2025, at Defendants' sales desk, Plaintiff placed a call to NFCU on speakerphone. Plaintiff, witness Christian Wright, salesperson Trevor Carr, and sales manager Greg Poland were present and could hear the call.

14. During the call, the NFCU representative spoke directly with Greg Poland and stated, in substance, that Plaintiff was preapproved with NFCU, NFCU had already run Plaintiff's credit, Plaintiff did not need to apply for dealership financing, and NFCU would be the lender for the transaction.

15. The NFCU representative further stated, in substance, that because NFCU
would fund the purchase and had already evaluated Plaintiff, Defendants did
not need to obtain Plaintiff's consumer report to proceed with an NFCU-
funded purchase.

16. Greg Poland disagreed and insisted words to the effect that "that's not how
it works here," that Defendants must pull credit regardless of outside
financing, and that Plaintiff could not obtain the vehicle through Defendants
unless Defendants pulled Plaintiff's credit. Plaintiff understood from this
exchange that Defendants were demanding access to Plaintiff's consumer
report as a dealership condition to proceed, despite confirmed outside
financing and Plaintiff's refusal to initiate dealership credit.

17. Before the call ended, the NFCU representative asked for Plaintiff back on
the line and advised Plaintiff that Plaintiff could leave the dealership and
that NFCU could offer other inventory options. Plaintiff stated Plaintiff
would leave because Plaintiff did not want Defendants to run Plaintiff's
credit report. Plaintiff then began walking toward the exit with Christian
Wright and Trevor Carr.

18. Plaintiff had NFCU preapproval and could have completed the purchase
through NFCU without Defendants obtaining tri-bureau consumer reports.
After the inquiries were obtained, Defendants immediately referenced
Plaintiff's score and attempted to sell Plaintiff dealership-arranged financing
terms, consistent with obtaining/using the reports for financing solicitation
rather than a narrow verification step.

**C. "Identity verification" pressure continues while Plaintiff is walking
out**

19. While walking toward the exit, Trevor Carr apologized and questioned why
it was "such a big deal" not to run Plaintiff's report if Plaintiff "has good
credit."

1
2
3
4
5
6
7

20. During that same walk-out conversation, Carr stated words to the effect that Defendants "still have to run credit" even for "identity verification," and that the credit pull was required before the sale could be completed. Carr further stated words to the effect that, especially after the pandemic, "all dealerships require it now" even when the customer has outside financing, and that Defendants required a credit pull as a condition of completing the transaction.

8
9
10
11
12
13

21. Plaintiff reiterated that Plaintiff did not want Plaintiff's credit run and was leaving. Plaintiff had been searching for vehicles and had not found another vehicle Plaintiff wanted. As Plaintiff and Christian Wright continued toward the exit, Defendants' staff continued discussing the vehicle and repeated that there was "no other form" for identity verification and that the process was "basically the same thing."

14
15
16
17
18

22. Under continued pressure and repeated statements that running credit was required as a condition of completing the sale and that there was no alternative identity-verification method, Plaintiff proceeded with paperwork **without requesting dealership credit or lender-shopping** rather than leaving.

19
20

**D. Plaintiff did not request dealer credit or lender-shopping and repeatedly refused dealer financing**

21
22
23
24

23. Plaintiff and witness Christian Wright returned with salesperson Trevor Carr to the sales desk. Plaintiff was not in a finance office and did not meet with a finance manager at that time.

25
26
27
28

24. At the sales desk, Carr handed Plaintiff a document and stated words to the effect that Defendants needed to "verify identity," that there was "no separate form" for identity verification, and that "because it's basically the same," Plaintiff should "just look and see what you would get," "just because." Carr presented the document as a required step to proceed with the

7

1  purchase, even though Plaintiff had outside financing and had just stated he

2  was leaving to avoid a credit pull.

3  25. The document Plaintiff was handed was labeled as a "credit application."

4  Plaintiff was rushed through the process. Carr directed Plaintiff where to

5  complete the fields and move through the document quickly. Plaintiff did

6  provide his Social Security number on the document. Plaintiff did not

7  receive a copy of the document at the time of signing and did not possess a

8  copy until later, when Finance Director Gary Kazandjian emailed Plaintiff a

9  copy after Plaintiff requested deletion support.

10  **E. Defendants caused hard inquiries and then used Plaintiff's**

11  **score/report results to solicit financing**

12  26. Plaintiff did not go to Defendants to seek dealership-arranged financing, did

13  not ask Defendants to submit Plaintiff's information to lenders, and did not

14  request rate-shopping. Plaintiff's purpose was to complete the purchase

15  using NFCU funding, not to initiate a dealership-credit transaction. Plaintiff

16  never requested Defendants to obtain competing lender offers and never

17  requested any rate-shopping. Plaintiff's NFCU preapproval was sufficient to

18  complete the purchase without dealership-arranged credit.

19  27. Plaintiff later discovered tri-bureau hard inquiries:

20

21  **27(a).** The hard inquiries appear on Plaintiff's credit files as follows:

22  (1) **Experian** — inquiry dated **July 15, 2025**, subscriber/name shown

23  **"AUTONATION FINANCE/DS"**, source **Experian**, company

**AUTONATION FINANCE/DS**, address **6 Executive Cir Ste 100, Irvine,**

24  **CA 92614-6732**, phone **(949) 250-7102.** Experian identifies the inquiry's

25  business type as **"Auto Financing Companies."**

26  (2) **Equifax** — inquiry dated **July 16, 2025**, subscriber/name shown

27  **"AUTONATION FINANCE"**, source **Equifax**, company **AUTONATION**

28  **FINANCE**, address **6 Executive Circle, Irvine, CA 92614**; and

8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(3) **TransUnion** — inquiry dated **July 17, 2025**, subscriber/name shown
**"ADPAUTONATION"**, source **TransUnion**, company
**ADPAUTONATION**, address **24030 Creekside Rd, Valencia, CA 91355.**

**27(b).** These entries reflect that Defendants, acting directly and/or through
their financing channel(s) and associated user identities, **obtained and/or
caused to be obtained** Plaintiff's consumer reports from each CRA.

**27(c).** Plaintiff initiated only an NFCU-funded purchase transaction and did
not initiate, request, or authorize any dealership-credit transaction, lender
submission, or rate-shopping; Plaintiff expressly declined dealership-
arranged financing and initially refused any credit pull for dealership credit
or lender submissions, and attempted to leave to prevent any inquiry.

28. Plaintiff's understanding—based on Carr's repeated statements—was that
Defendants were requiring consumer report access as "identity verification"
as a condition to proceed, not that Plaintiff was applying for dealership
credit or authorizing dealership lender submissions. Plaintiff continued to
state that he did not want dealership-arranged financing.

29. After Defendants obtained Plaintiff's consumer report information, Trevor
Carr returned and stated words to the effect: "Oh man, you know your score
is a 747," asked what interest rate NFCU was offering, and stated
Defendants could "save" Plaintiff money.

30. Plaintiff explained that NFCU's terms were approximately 60 months at
14.79% APR, and Plaintiff reiterated that Plaintiff would stay with NFCU
and did not want dealership-arranged financing.

31. Greg Poland then approached Plaintiff and repeatedly pressured Plaintiff to
abandon NFCU financing, asking why Plaintiff would stay with NFCU
"when they are charging so much more," questioning Plaintiff's monthly
payment, and stating it "doesn't make sense" given Plaintiff's credit score.

32. Greg Poland proposed dealership-arranged terms including approximately
72 months at ~11% APR, representing that payments could remain "around
the same." Plaintiff refused and reiterated Plaintiff would stay with NFCU.

33. After a further interval, Greg Poland returned and proposed approximately
72 months at ~8.99% APR. Plaintiff refused again and stated Plaintiff would
stay with Plaintiff's preapproved bank.

34. Defendants' repeated efforts to change Plaintiff's financing—after
referencing Plaintiff's credit score and loan terms—show Defendants used
Plaintiff's consumer report results for dealership financing solicitation and
dealer-credit decisioning, rather than for any narrow identity-verification
purpose. Even if Defendants contend Plaintiff executed paperwork
authorizing a consumer report, Plaintiff alleges Defendants' actual use of the
report—pressuring Plaintiff to abandon NFCU and accept dealership-
arranged financing after repeated refusals—exceeded any permissible scope
and shows the report was obtained and used for dealership financing
solicitation and lender-shopping that Plaintiff did not initiate.

35. During these interactions, Defendants repeatedly demanded explanations
("Why?") and would not accept Plaintiff's "no," compelling Plaintiff to
discuss personal financial plans in order to justify staying with NFCU.

**F. Adverse action notice; refusal to correct**

36. Plaintiff received or later obtained a dealership Notice of Adverse Action
dated July 15, 2025, reflecting credit decisioning activity based on consumer
report information in connection with Plaintiff's vehicle purchase
transaction.

**36(a).** The Adverse Action notice reflects dealership decisioning and is not
inconsistent with the credit-report inquiry subscriber names, which reflect
the specific user identity that accessed Plaintiff's file at each CRA through
Defendants' financing channel(s).

10

1  37. Plaintiff notified dealership management and demanded deletion
2      support/correction, explaining Plaintiff had outside financing, refused dealer
3      financing, attempted to leave to prevent a credit pull, and did not authorize
4      Defendants to use Plaintiff's report for financing solicitation.

5  38. Plaintiff signed the document only after Carr repeatedly represented that the
6      credit pull was required for "identity verification" and required to proceed;
7      Plaintiff did not intend to apply for dealership-arranged financing or
8      authorize lender submissions or rate-shopping.

9  **G. "Credit application" issue**

10 39. Plaintiff does not assert a standalone claim for fraud or misrepresentation.
11     "Identity verification" statements are pleaded solely to show the
12     circumstances, scope, and quality of any alleged authorization, and
13     Defendants' willfulness/recklessness.
14

15                          **CLAIMS FOR RELIEF**

16 *COUNT I — Obtaining/Using Consumer Reports Without a Permissible Purpose*

17                  *(15 U.S.C. § 1681b(f)(1); § 1681b(a)*

18 40. Plaintiff realleges paragraphs 1–39.
19

20 41. **Obtained a consumer report from a CRA.** Defendants obtained and/or
21     caused to be obtained Plaintiff's consumer reports from consumer reporting
22     agencies and caused hard inquiries to be recorded. Specifically, Defendants
       obtained Plaintiff's consumer reports from Experian, Equifax, and
23     TransUnion, as reflected by hard inquiries dated on or about July 15–17,
24     2025.
25

26 42. **Without a permissible purpose (purpose and scope).** Defendants did not
27     obtain Plaintiff's consumer reports for a permissible purpose under 15
       U.S.C. § 1681b(a) because Plaintiff did not seek dealership-arranged credit
28     or lender submissions, expressly declined dealership-arranged financing, and

1  initially refused any credit pull for dealership credit or lender submissions;
2  nevertheless, Defendants obtained tri-bureau reports and then used the
3  results to solicit dealership financing and alternative dealer terms that
4  Plaintiff did not request. Defendants' conduct was not undertaken for
5  employment, insurance underwriting, or governmental licensing/benefits, §
6  1681b(a)(3)(B)–(E).

7  Defendants also lacked a legitimate business need within the meaning of §
8  1681b(a)(3)(F) **to obtain tri-bureau reports and use the results for**
9  **dealer-credit solicitation and lender-shopping** after Plaintiff expressly
10 declined dealership-arranged financing and attempted to leave to prevent any
11 credit pull.

12 Plaintiff arrived with independent, preapproved financing through NFCU
13 and repeatedly declined dealership-arranged financing. Defendants were told
14 on speakerphone by NFCU that Plaintiff had already been approved and that
15 a dealership credit pull was not required for NFCU financing. Despite that,
16 Defendants caused tri-bureau hard inquiries and then used the results
17 (including Plaintiff's score) to solicit and negotiate dealership-arranged
18 financing terms Plaintiff did not request. Defendants' asserted "identity
19 verification" rationale is not itself a stand-alone permissible purpose for tri-
20 bureau hard inquiries, and Defendants' actual use of the results for financing
21 solicitation confirms the purpose and scope exceeded any permissible
22 purpose under § 1681b.

23
24 43. **Willfully or negligently.** Defendants obtained and/or used Plaintiff's
25 consumer reports willfully or, in the alternative, negligently, including by
26 proceeding after Plaintiff's refusal and after the NFCU speakerphone
27 confirmation, and by using the report results to pitch dealership-arranged
28 credit.

44. **Scope/use after refusal.** To the extent Defendants contend any written authorization existed, Plaintiff alleges Defendants' tri-bureau access and subsequent use for dealership-credit solicitation/lender-shopping exceeded any permissible scope and occurred after Plaintiff's express refusal. Defendants' conduct is shown by what they did immediately after obtaining the reports—using Plaintiff's score and loan terms to push dealership-arranged financing. Supporting facts include:

**44(a).** Plaintiff expressly declined dealership financing, initially refused any credit pull for dealership credit or lender submissions, and attempted to leave to prevent any inquiry;

**44(b).** NFCU informed Defendants on speakerphone that NFCU had already run Plaintiff's credit, that Plaintiff did not need to apply for dealership financing, and that NFCU would fund the transaction;

**44(c).** Defendants nevertheless caused tri-bureau hard inquiries and then used the report results to solicit dealership financing—including telling Plaintiff his score was "747," criticizing NFCU terms, and proposing alternative dealership terms (~11% then ~8.99% at 72 months)—confirming the reports were obtained and used for dealership financing solicitation and lender-shopping; and

**44(d).** Defendants' tri-bureau access was not necessary to complete an NFCU-funded purchase and instead served dealership-arranged credit solicitation/lender-shopping after refusal.

45. By obtaining and/or using Plaintiff's consumer reports without a permissible purpose and outside any permissible scope, Defendants violated 15 U.S.C. § 1681b(f)(1).

### _COUNT II — Willful Noncompliance_

### _(15 U.S.C. § 1681n)_

46. Plaintiff realleges paragraphs 1–45.

47. Defendants acted willfully or in reckless disregard of the FCRA because:

**47(a).** Defendants proceeded after Plaintiff refused a credit pull and
attempted to leave to prevent it;

**47(b).** Defendants insisted a credit pull was required for "identity
verification" despite outside financing and NFCU's speakerphone
confirmation that NFCU had already evaluated Plaintiff and would be the
lender;

**47(c).** Defendants then used the report results to solicit dealership financing,
including quoting Plaintiff's score ("747"), criticizing NFCU terms, and
proposing alternative dealer terms (~11% then ~8.99% at 72 months); and

**47(d).** After Plaintiff's written notice and demand, Defendants refused to
take reasonable corrective steps.

48. Plaintiff seeks statutory damages, punitive damages, and costs and
reasonable attorneys' fees as allowed by § 1681n.

### *COUNT III — Negligent Noncompliance (Pled in the Alternative)*

### *"(15 U.S.C. § 1681o)"*

49. Plaintiff realleges paragraphs 1–48.

50. In the alternative, Defendants negligently failed to ensure a permissible
purpose existed before **obtaining and/or causing to be obtained** Plaintiff's
consumer reports and causing hard inquiries.

51. Plaintiff seeks actual damages and costs under § 1681o.

### DAMAGES

52. Plaintiff suffered damages including credit harm associated with multiple
hard inquiries, impairment of credit opportunities, time spent disputing and
mitigating, out-of-pocket costs, and emotional distress. Damages will be
proven at trial.

## **PRAYER FOR RELIEF**

Plaintiff requests judgment against Defendants for:

**A.** Actual damages;

**B.** Statutory damages (if willful);

**C.** Punitive damages (if willful);

**D.** Costs and such other relief as the Court deems just and proper.

**E.** Reasonable attorneys' fees and costs as allowed by law.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

## **SIGNATURE**

Dated: February 11th, 2026

x _____

Respectfully submitted,

/s/ Lindon Andre Voglezon II

Lindon Andre Voglezon II, Plaintiff Pro Se

**First Amended Complaint Exhibit List**

*Lindon Andre Voglezon II v. CIG Financial, LLC dba AutoNation Finance, and Valencia B Imports, Inc. dba Valencia BMW*

Plaintiff submits the following exhibits in support of his Complaint:

## INDEX OF EXHIBITS
(First Amended Complaint)

| Exhibit | Description |
|---------|-------------|
| **Exhibit A** | **Navy Federal Credit Union Pre-Approval** (dated July 10, 2025) — "Congrats! Your Auto Loan Is Preapproved." |
| **Exhibit B** | **Credit Report Inquiry Evidence** — screenshots showing hard inquiries dated **on or about July 15–17, 2025** (Experian/Equifax/TransUnion) with subscriber names/addresses reflecting "AutoNation Finance" and "ADP AutoNation" variants. |
| **Exhibit C** | **Email(s) to Dealership Management** (dated July 25, 2025) — Plaintiff's written notice and demand for deletion/correction describing outside financing, speakerphone NFCU call, refusal of dealer financing, and request for inquiry removal. |
| **Exhibit O-2** | **Declaration of Christian Wright (Supplemental)** — corroborating the speakerphone NFCU call sequence, Plaintiff's walk-out attempt, "identity verification" pressure, score reference, rate pitches, and repeated refusals. |

Plaintiff reserves the right to submit additional exhibits as discovery proceeds.



→  C  ⚏ usa.experian.com/mfe/support/unifiedalerts/all?filter=all          ☆  ⟳  ▤  L  **New Chrome available**

### AUTONATION FINANCE/DS got a copy of your Experian Credit Report.

JUL 15, 2025

AUTONATION FINANCE/DS recently checked your Experian credit file for an installment loan or new bank account. When you apply for certain types of credit, a hard inquiry is placed on your credit file and stays on your report for about 2 years.

**Source:**
Experian

**Company:**
AUTONATION FINANCE/DS

**Address:**
6 Executive Cir Ste 100, Irvine, CA 92614-6732

**Phone:**
(949) 250-7102

#### WHAT NOW?

If you are finished applying for new credit, we recommend locking your credit file to prevent unauthorized access. With Experian CreditLock, you can always unlock at the click of a button.



Not you? ∨

**Exhibit B – Screenshot of Hard Credit Inquiries**



usa.experian.com/mfe/support/unifiedalerts/all?filter=all

New Chrome available



**AUTONATION FINANCE got a copy of your Equifax Credit Report.**

JUL 16, 2025

AUTONATION FINANCE made a Inquiry by checking your Equifax Credit Report.

**Source:**
Equifax

**Company:**
AUTONATION FINANCE

**Address:**
6 Executive Circle, Irvine, CA 92614

**NOT YOU?**

If anything is incorrect, please dispute with Equifax®.

Why am I receiving this?

You are receiving this alert because your membership includes 3-bureau credit monitoring & alerts. We'll notify you of any changes to your Experian, Equifax and TransUnion credit files. Changes could affect your score, score rating and ability to receive and use credit.

Check out your credit overview

**Exhibit B – Screenshot of Hard Credit Inquiries**



usa.experian.com/mfe/support/unifiedalerts/all?filter=all

New Chrome available

**ADPAUTONATION got a copy of your TransUnion Credit Report.**

JUL 17, 2025

ADPAUTONATION made a Inquiry by checking your TransUnion Credit Report.

**Source:**
TransUnion

**Company:**
ADPAUTONATION

**Address:**
24030 Creekside Rd, Valencia, CA 91355

**NOT YOU?**

If anything is incorrect, please dispute with TransUnion®.

Why am I receiving this?

You are receiving this alert because your membership includes Experian credit monitoring & alerts. We'll notify you of any changes to your Experian credit file. Changes could affect your score, score rating and ability to receive and use credit.

Check out your credit overview

**Exhibit B – Screenshot of Hard Credit Inquiries**

## Exhibit O-2 – Supplemental Declaration of Christian Wright

I, Christian Wright, declare:

1. I am over the age of 18 and competent to testify to the matters stated in this declaration. I have personal knowledge of the facts stated below and, if called as a witness, could and would testify truthfully to them.
2. I accompanied Plaintiff Lindon Andre Voglezon II to the Valencia BMW / AutoNation BMW Valencia dealership in July 2025 when he attempted to purchase a vehicle using his preapproved loan through **Navy Federal Credit Union** ("NFCU").
3. I heard Lindon tell dealership staff, including the salesperson **Trevor Carr** and the sales manager **Greg Poland**, that he was using NFCU financing and that he did not want dealership-arranged financing.
4. While we were at the sales desk, I observed Lindon call NFCU on speakerphone. I could hear the NFCU representative and I observed dealership staff, including Greg Poland, participate in the call.
5. I heard the NFCU representative state words to the effect that Lindon was preapproved and that a dealership credit check was not required to proceed with the purchase using NFCU financing. Before ending the call, the NFCU representative asked for Lindon to return to the line and told him he could leave the dealership and that NFCU could offer other inventory options.
6. After that, I observed Lindon begin to leave the dealership because he did not want his credit pulled. As we were walking toward the exit, Trevor Carr apologized for how the situation had unfolded and questioned why it was such a big deal to not to run Lindon's report, especially if he had good credit. I heard Trevor Carr state words to the effect that they still had to run credit for "identity verification" and that all dealerships require it now, even if the customer has outside financing.
7. I also heard statements from dealership staff to the effect that there was "no other form" for identity verification.
8. After the dealership obtained credit information, I heard Trevor Carr tell Lindon words to the effect that Lindon's credit score was "747," and asked what interest rate NFCU was offering, stating that the dealership could save him money.
9. I heard Lindon explain that his NFCU terms were approximately **60 months at 14.79% APR**, and I heard him state that he would stay with NFCU and did not want dealership financing.
10. I observed Greg Poland repeatedly press Lindon to change financing away from NFCU and questioned why Lindon would stay with NFCU if the interest rate was higher. I heard Greg Poland propose dealership financing terms, including approximately **72 months at about 11% APR**, and later approximately **72 months at about 8.99% APR**.
11. I heard Lindon refuse these dealership financing offers multiple times and state that he would stay with his preapproved bank. I observed Lindon becoming visibly frustrated because dealership staff repeatedly pressed him for explanations and would not accept "no" as an answer.
12. At no time did I hear Lindon request dealership financing or ask the dealership to submit him to lenders. He repeatedly stated he was using NFCU.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

Executed on **February 2nd**  , 2026, at _____, California.

Christian Wright

 **Gmail**

Lindon Voglezon <b█████@gmail.com>

---

## Formal Request for Credit Inquiry Removal – FCRA Violation
6 messages

---

**Lindon Voglezon** <b█████@gmail.com>
To: KazandjianG@autonation.com
Cc: PolandG@autonation.com, ahmadiel@autonation.com

Fri, Jul 25, 2025 at 3:34 PM

**Dear Mr. Kazandjian,**

I'm writing to formally request that your dealership submit credit inquiry removal requests to **Experian, Equifax, and TransUnion** for inquiries made on or around **July 14, 2025** in connection with my recent purchase of a **2023 Lexus ES 300h**.

I arrived at the dealership already having a **pre-approval through Navy Federal Credit Union**, which I clearly stated multiple times to both **Sales Manager Greg Poland** and **Salesperson Trevor Carr**. Despite explicitly informing them that I did **not wish to use AutoNation financing**, and despite a **live call with Navy Federal** (on speakerphone), I was told that AutoNation "must" run my credit — even though no credit was being extended by your dealership.

I was misled and pressured into allowing a hard inquiry that I made clear was unnecessary and unwanted. **I did not use AutoNation for financing.** I paid with my Navy Federal pre-approval check, as planned. The check was originally submitted, then re-submitted on **July 23, 2025** to **Eddie Ahmadie**, due to scan issues. Per my recent conversation with **Experian (Bre, Case #: 159868057)**, I am requesting a **Letter of Deletion** on your dealership's letterhead confirming that:

- I **did not obtain credit through AutoNation**
- The credit inquiry was made in error or under a misunderstanding
- You support the deletion of the inquiry from my credit reports

This is necessary so that I may formally request removal through the credit bureaus.

Per the **Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681b)**, a company must have a **permissible purpose** and **clear consumer authorization** to run a hard inquiry. Since no credit was extended, and I explicitly declined authorization for AutoNation financing, the inquiry lacks valid legal justification.

I would appreciate confirmation that:

1. You will issue a letter of deletion; or
2. You will submit removal requests directly to the bureaus.

If this cannot be resolved within **7 business days**, I will proceed with formal disputes to **Experian, Equifax, TransUnion**, and file complaints with the **CFPB, FTC, BBB**, and the **California Attorney General's Office** for FCRA violations and resulting damages.

Thank you for your attention and your cooperation in resolving this matter professionally.

Sincerely,
**Lindon Andre Voglezon II**
Phone: █████-9040
Email address: b█████@gmail.com (preferred)

11/26/25, 9:57 AM · Gmail — Congrats! Your Auto Loan Is Preapproved.

Case 8:25-cv-02407-FWS-ADS    Document 25    Filed 02/11/26    Page 23 of 24    Page ID #:243

 Gmail

**Lindon Voglezon <b████@gmail.com>**

---

## Congrats! Your Auto Loan Is Preapproved.
1 message

---

**Navy Federal Credit Union** <notice@email.navyfederal.org>       Thu, Jul 10, 2025 at 4:52 PM
To: b████@gmail.com

---

**Navy Federal Security Zone:**
Email for LINDON | Access XXXXXXXXXXXX43

# Congrats! You're Preapproved for an Auto Loan

Excellent news! Your auto loan is preapproved. You can review your tentative Annual Percentage Rate (APR) when you get your loan documents. This APR could change if the type of vehicle you buy is different from the one on your application or the loan term(s) change(s).[1] We'll list your final APR and your monthly payment on your promissory note once you choose and buy your vehicle.

Depending on how you chose to receive your documents, we'll mail them with a check for your loan, or you can pick them up at a branch. If you chose branch pick-up, go to any **Navy Federal branch** and bring a valid ID.

If you're still looking for your next vehicle, check out the Navy Federal **Car Buying Service, powered by TrueCar®**,[2] to see up-front pricing on new and used cars.

Thanks for choosing Navy Federal for your auto loan.

### Our Members Are the Mission®

---

Contact Us  |  Security  |  Mobile Banking  |  Privacy Policy  |  View in Browser

Please do not reply to this email. This email is being sent from: Navy Federal Credit Union, P.O. Box 3000, Merrifield, VA 22119-3000.

⌂ Equal Housing Lender | © 2025 Navy Federal Credit Union. All rights reserved. NFCU DNS 35357-A (2-24)

**Exhibit A – NFCU Pre-Approval Notice**                                **pg 23**

**Navy Federal is federally insured by NCUA.**

---

¹Please refer to your loan packet for a list of the reasons your Annual Percentage Rate could change.

²TrueCar operates the Navy Federal Car Buying Service. Navy Federal is not responsible for any offer, purchase, lease, or service provided by or through the Navy Federal Car Buying Service.